IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Allied World Surplus Lines Insurance : 
Company, :     Case No. 1:17-cv-670
 : 
    Plaintiff/Counterclaim Defendant, :     Judge Susan J. Dlott
 : 
        v. :     Order on Cross-Motions for Summary
 :     Judgment
Richard Goettle, Inc., : 
 : 
    Defendant/Counterclaim Plaintiff. : 

This matter is before the Court on cross-Motions for Summary Judgment. In this insurance case, Allied World Surplus Lines Insurance Company ("Allied World") seeks a declaration that it does not owe its insured, Richard Goettle, Inc. ("Goettle"), a duty of defense or indemnification arising from a construction lawsuit pending in Louisiana. Goettle has filed a Counterclaim against Allied World for defense and indemnification. For the reasons that follow, the Court will **DENY IN PART** Allied World's Motion for Summary Judgment (Doc. 62) and **GRANT IN PART** Goettle's Motion for Summary Judgment (Doc. 61).

I.     <u>BACKGROUND</u>[1]

Allied World, a subsidiary of Allied World Assurance Company Holdings, GmbH, is an Arkansas corporation with its principal place of business in New York. Allied World provides professional liability coverage to engineering and contracting firms for their liability risks.

Goettle is an Ohio corporation with its principal place of business in Ohio. It is an engineering and construction firm that provides commercial engineering, earth retention, pile foundation systems, and other related services.

---

[1] The material facts are derived in part from the parties' Proposed Undisputed Facts (Docs. 61-1, 62-2) and the Responses thereto (Doc. 65-1, 66-1).

Goettle utilized USI Insurance Services ("USI Insurance") as its insurance broker. (Ginter Dep., Doc. 41 at PageID 510.) USI Insurance contacted Cincinnati Intermediaries, a wholesale insurance brokerage firm, to assist with applying for Goettle's professional liability insurance through Allied World.

In April 2016, Goettle applied for an architects and engineers professional liability policy from Allied World using an application sent to Allied World by Richard Bolan of Cincinnati Intermediaries. On June 15, 2016, Denise Rose, an underwriter with Allied World, emailed Mr. Bolan of Cincinnati Intermediaries a quote for the insurance, a copy of the draft policy, and various draft endorsements to the policy. Among those endorsements sent by Allied World to Cincinnati Intermediaries was a draft endorsement entitled "COVERED OPERATIONS— POLLUTION COVERAGE ENDORSEMENT." On June 24, 2016, Mr. Bolan sent to Ms. Rose an email suggesting an amendment to the pollution coverage endorsement which would add a new category to "who might also be an Additional Insured." (Doc. 41-1 at PageID 571–572.) On June 27, 2016, John Savickas, a senior underwriter at Allied World, emailed Mr. Bolan an amended version of the pollution coverage endorsement. Later that day, Beth Malone of USI Insurance instructed Cincinnati Intermediaries to "bind and issue the Professional/Pollution Liability and Excess Professional/Pollution Liability as follows: . . . 1. With the revised Pollution form attached." (Doc. 41-2 at 579.)

## A.    The Professional Liability Policy

Allied World issued Goettle a Constructors Professional Liability and Protective Policy No. 0310-2122 for the Policy Period from June 28, 2016 to June 28, 2017 ("2016–2017 Policy"). (Doc. 41-3 at PageID 631.) Allied World is referred to as the Company and Goettle as the Insured in the Policy. The Declarations Page stated that "This Policy is comprised of the

Declarations Page, the Policy Form, the Schedules, the Application and [seven] endorsements."

(Doc. 41-3 at PageID 632; Doc. 41-7 at PageID 689.)[2]  The Declarations Page stated on its face:

> THIS IS A CLAIMS MADE AND REPORTED POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE COMPANY PURSUANT TO THE TERMS OF THE POLICY.
>
> _____
>
> PLEASE READ THE ENTIRE POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE BROKER.

(Doc. 41-3 at PageID 631; Doc. 41-7 at PageID 688.)

The 2016–2017 Policy provided claim limits of $5,000,000 for Each Claim Limit and for Policy Term Aggregate Limit.  (Doc. 41-3 at PageID 631.)  Goettle paid a total premium of $135,550 for the 2016–2017 Policy.  (*Id.*)

**1.     The Policy Form**

Coverage Part A of § I. INSURING AGREEMENT of the Policy Form provided in relevant part as follows:

> A. The Company will pay Damages and Defense Expenses that the Insured shall become legally obligated to pay as a result of a Claim first made during the Policy Period and reported in writing to the Company during the Policy Period or within sixty (60) days thereafter arising out of a Wrongful Act in the rendering or failure to render Professional Services to others by the Insured or by any person or entity for whom the Insured is legally liable and to which this Policy applies.
>
> B. For this Policy to apply, both of the following conditions must be met:
>
> > 1. The Wrongful Act must first take place on or after the Retroactive Date shown in Item 6. of the Declarations and prior to the end of the Policy Period;
> >
> > 2. Prior to the Effective Date of this Policy, no officer, director, principal, partner, insurance manager, risk manager or in-house counsel of any

---

[2] As will be discussed *infra*, Goettle renewed its policy with Allied World for the 2017–2018 term with the same relevant provisions.  For simplicity, citations to both the 2016–2017 Policy (Doc. 41-3) and the 2017–2018 Policy (Doc. 41-7) are provided above.  All of the defined terms in the both Policies begin with a capital letter and are in bold text.  The Court has deleted the bold text emphasis used within the Policies for readability.

Insured had knowledge of the actual or alleged Wrongful Act or circumstance that reasonably could give rise to a Claim under this Policy. If such officer, director, principal, partner, insurance manager, risk manager or in-house counsel of any Insured knew, prior to the effective date of this Policy, of any Wrongful Act or circumstance that reasonably could give rise to a Claim under this Policy, then any continuation, change or resumption of such Wrongful Act or circumstance during or after this Policy Period will be deemed to have been known prior to this Policy Period;

(Doc. 41-3 at PageID 652; Doc. 41-7 at PageID 715.)

The Defense Provisions in § I(D) required Allied World to provide a defense to Goettle

in the following circumstances:

The Company will have the right and duty to defend any Claim made against the Insured seeking Damages payable under this Policy. The Company shall undertake and manage the defense of such Claim even if the allegations of the Claim are groundless, false or fraudulent. . . .

(Doc. 41-3 at PageID 653; Doc. 41-7 at PageID 716.)

The Policy Form contained the following relevant definitions in § IV. DEFINITIONS:

B. Claim means a demand received by an Insured for money or services including the service of suit or institution of arbitration proceedings. Claim does not include a Disciplinary Proceeding.

* * *

Q. Potential Claim means an actual or alleged act, error or omission in the performance of Professional Services which may reasonably be expected to give rise to a Claim.

* * *

S. Professional Services means those services that:

1. the Insured is qualified to perform; and

2. are performed for others, in the Insured's capacity as an architect, engineer, land surveyor, landscape architect, scientist, technical consultant or Construction Manager, including such services when performed on projects seeking LEED certification and/or utilizing Building Information Modeling (BIM).

* * *

4

T.  Wrongful Act means a negligent act, error or omission, in the rendering of or failure to render Professional Services by an Insured.

(Doc. 41-3 at PageID 659–662; Doc. 41-7 at PageID 722–725.)

Pursuant to the provisions above, the Policy provided coverage for wrongful acts in the rendering or failure to render professional services, including negligence in performing engineering services.  However, the Policy Form contained § III. EXCLUSIONS, including a coverage exclusion for faulty construction services:

This insurance does not apply to and the Company will not pay Damages, Defense Expenses and/or Loss for any Claim based upon or arising out of:

* * *

C. CONSTRUCTION

Any actual or alleged obligation on the part of the Insured for construction means, methods, techniques, sequences or procedures.

* * *

I. FAULTY WORKMANSHIP

The cost to repair or replace any faulty workmanship including, but not limited to faulty: assembly, construction, erection, fabrication, installation, remediation, dismantling, excavation or manufacturing by the Insured or any subcontractor of the Insured.

(Doc. 41-3 at 655–657; Doc. 41-7 at PageID 718–720.)

The Policy Form at § VIII. CONDITIONS required Goettle to provide notice to Allied World of a Claim made against it as a condition precedent to coverage:

As a condition precedent to the right of coverage under this Policy, the Insured must do all of the following:

A. INSURED'S DUTIES WHEN THERE IS A CLAIM

1. If a Claim is made against an Insured, the Insured shall give written notice to the Company, as soon as practicable, but in no event later than sixty (60) days after the expiration date or earlier termination date of the Policy.

Such written notice shall include all of the following:

> a. The actual or alleged Wrongful Act which is the subject of the Claim;

> b. A description of the Professional Services rendered by the Insured;

> c. The date(s) that such Professional Services were rendered;

> d. A description of the alleged injury or damage that is the subject of the Claim;

> e. The identities and addresses of the claimant(s); and

> f. The project(s) involved in the Claim.

> Written notice shall also include every demand, notice, summons or other process received by the Insured or the Insured's representatives.

(Doc. 41-3 at PageID 663–664; Doc. 41-7 at PageID 726–727.) Section VIII. also provided

Goettle with an option to provide notice of a Potential Claim under Coverage Part A:

> B. NOTICE OF A POTENTIAL CLAIM UNDER COVERAGE PART A

> 1. If during the Policy Period, any Insured becomes aware of a Potential Claim, the Insured may provide written notice to the Company during the Policy Period containing all the information listed under paragraph 2. below. Any Potential Claim that subsequently becomes a Claim shall be deemed to have been first made and reported on the date and time when the Company was first notified of the Potential Claim. Such Claim shall be subject to the terms, conditions and limits of coverage of the Policy under which the Potential Claim was reported.

(Doc. 41-3 at PageID 664; Doc. 41-7 at PageID 727.)

**2.** **Endorsement 7**

The Policy included an Endorsement No. 7 entitled "COVERED OPERATIONS–

POLLUTION COVERAGE ENDORSEMENT." (Doc. 41-3 at PageID 646; Doc. 41-7 at

PageID 709.) It provided in relevant part as follows:

> 1. Section I. INSURING AGREEMENTS, COVERAGE PART A, Subsections A. and B. are deleted in their entirety and replaced with the following:

6

A. The Company will pay those sums that the Insured shall become legally obligated to pay as Damages and Defense Expenses because of:

    1. A Wrongful Act in the rendering or failure to render Professional Services to others by the Insured or any entity for whom the Insured is legally liable and to which this insurance applies; and /or

    2. Covered Operations performed for others by the Insured or any entity for whom the Insured is legally liable which result in a Pollution Condition and to which this insurance applies.

B. For this Policy to apply, all of the following conditions must be met:

    1. The Wrongful Act or Covered Operations must first take place on or after the Retroactive Date shown in Item 6. of the Declarations and prior to the end of the Policy Period;

    2. Prior to the Effective Date of this Policy, no officer, director, principal, partner insurance manager, risk manager or in-house counsel of any Insured had knowledge of any actual or alleged Wrongful Act, Pollution Condition or circumstance that reasonably could give rise to a Claim under this Policy.  If such officer, director, principal, partner, insurance manager, risk manager or in-house counsel of any Insured knew, prior to the effective date of this Policy, of any Wrongful Act or Pollution Condition or circumstance that reasonably could give rise to a Claim under this Policy, then any continuation, change or resumption of such Wrongful Act, Pollution Condition or circumstance during or after this Policy Period will be deemed to have been known prior to this Policy Period;

    3. Any Claim must first be made against the Insured during the Policy Period; and

    4. The Insured must report the Claim to the Company, in writing, during the Policy Period or within sixty (60) days after the end of the Policy Period.

* * * *

4. Section IV. DEFINITIONS, Subsections B. and D. are deleted in their entirety and replaced with the following:

B. Claim means any demand or notice received by an Insured alleging a Wrongful Act or Pollution Condition.  A Claim does not include a Disciplinary Proceeding.

* * * *

6. Section IV. DEFINITIONS is amended to include Subsections U. through BB., inclusive, as follows:

* * * *

V. Covered Operations means those physical construction operations and activities performed for others by the Insured or any entity for whom the Insured is legally liable[.]

* * * *

AA. Pollution Condition means the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water, provided such conditions are not naturally present in the environment.

* * * *

9. Except with respect to Section VIII. CONDITION, Subsection K.3. for which Paragraph 8. above applies, with respect to this Endorsement only, all other Conditions in Section VIII. CONDITIONS which use the term Wrongful Act shall be read as if Wrongful Act has been deleted and replaced with Pollution Condition for the purposes of the application of this Endorsement.

10. With respect to this Endorsement only, all Conditions in Section VIII. CONDITIONS that use the term Professional Services shall be read as if Professional Services has been deleted and replaced with Covered Operations for the purposes of the application of this Endorsement.

(Doc. 41-3 at PageID 646, 648–650; Doc. 41-7 at PageID 709, 711–713.)

## B.  **Application for Renewal of Insurance Policy**

On February 24, 2017, Ms. Malone from USI Insurance emailed to Goettle CFO Jeff

Ginter an "Allied World renewal application" under the subject heading "Professional/Pollution

Liability Renewal App."  Mr. Ginter emailed Ms. Malone on March 29, 2017 the policy renewal

application form signed by him.  (Doc. 41-4 at PageID 670–679.)  The policy renewal

application contained the following question 21:

21.  After inquiry, do any partners, principals, directors, officers, or employees of the firm for which coverage is sought, have knowledge of any act, error or omission, unresolved job dispute (including fee disputes), accident or any other

circumstance that is or could be the basis for a claim under this proposed insurance policy?

If yes, please provide details on a separate sheet, including project name, and potential claimant, dates, and damages.

IT IS UNDERSTOOD AND AGREED THAT IF SUCH KNOWLEDGE OR INFORMATION EXISTS, ANY CLAIM ARISING THEREFROM IS EXCLUDED FROM THIS INSURANCE.

(*Id.* at PageID 676.)  Mr. Ginter answered "No" to question 21 on behalf of Goettle based on information he knew from attending weekly meetings with Goettle officers, project managers, and safety personnel.  (*Id.*; Ginter Dep., Doc. 41 at PageID 527.)  The renewal application included a duty to update information in § 26:

The undersigned authorized representative agrees that if the information supplied on this Application changes between the date of this Application and the effective date of the insurance, he/she will, in order for the information to be accurate on the effective date of the insurance, immediately notify the Insurer of such changes, and the Insurer may withdraw or modify any outstanding quotations or agreement to bind insurance.

. . . It is agreed that this Application shall be the basis of the contract if a policy is issued and shall be deemed to be attached to, incorporated into and become a part of the policy.

(Doc. 41-4 at PageID 677.)

USI Insurance requested Cincinnati Intermediaries to "bind and issue" Goettle's professional liability policy renewal on June 15, 2017.  (Doc. 41-5 at PageID 680.)  On June 21, 2017, USI Insurance provided Goettle with the "renewal binder and invoice for your Professional/Pollution Liability policy effective 6/28/17."  (Doc. 41-6 at PageID 684.)

The 2017–2018 Policy issued by Allied World to Goettle was effective for the period of June 28, 2017 through June 28, 2018.  (Doc. 41-7 at PageID 688.)  The 2017–2018 Policy had claim limits of $10,000,000 for Each Claim Limit and Policy Term Aggregate Limit.  (*Id.*)  It otherwise contained the same relevant policy provisions and coverages as the 2016–2017 Policy,

including the same relevant provisions in the Policy Form and Endorsement 7. (*Id.* at PageID 688–732.)

**C.** **The Event for Which Goettle Seeks Coverage**

On November 8, 2016, Goettle prepared and submitted to Joy Global Conveyors, Inc. a proposal for a retaining wall at a project called the "Dolet Hills Truck Dump" at a coal mine near Mansfield, Louisiana. Dolet Hills is a lignite (coal) mine that powers an American Electric Power ("AEP") power plant, and Goettle's proposal involved designing retaining walls for a ramp for dump trucks hauling coal. Goettle proposed to "furnish and install" certain components of the retaining wall system and to "[p]repare and submit design drawings detailing our work for the wall and bearing piles signed and sealed by a Professional Engineer Licensed in the State of Louisiana," for the lump sum price amount of $1,985,000. (Doc. 53-1 at PageID 3503–3506.)

Goettle commenced work on the project in November 2016, first with design then with construction and installation work. Goettle CEO Douglas Keller was the engineer of record for the project and oversaw the engineering and design of it. Mr. Keller supervised Aaron Klingshirn, a Goettle designer and licensed engineer, on the project. Part of Goettle's design work for the retaining wall involved calculations of the earth's pressure against the retaining walls.

There was a "failure incident" at the Dolet Hills mine on or about April 18, 2017. Keith Harrington of Joy Global advised Humphrey Barlow, a Goettle project manager, on April 21, 2017 via email and with photographs that he had heard large noises and saw material seepage coming from between the wood lagging on the retaining wall. (Doc. 59-3 at PageID 3978–3983.) When Mr. Barlow received the email and pictures, he thought it was a serious issue and understood that "[s]omething abnormal [is] going on with this project, with this retention wall."

(Doc. 59 at PageID 3863, 3865.)  He immediately forwarded the email and photos to Mr. Keller, Goettle's CEO, and Mr. Klingshirn, the engineer.  (Doc. 59-3 at PageID 3978–3983.) Mr. Ginter, Goettle's CFO who completed the insurance policy renewal application, first learned about the Dolet Hills incident in late April 2017.  (Ginter Dep., Doc. 41 at PageID 536.)

Personnel from Goettle, including Mr. Keller, and from Joy Global, including Larry Atkinson, its principal engineer, participated in telephone calls and in-person meetings about the failure incident in April and May 2017.  Mr. Atkinson stated in an affidavit that the "focus" of the meetings was to determine the cause of the structural failure and to plan a repair, and not "to assign fault or make a claim against a particular party."  (Doc. 60-1 at PageID 4054.)  On May 2, 2017, Goettle's project manager emailed Mr. Atkinson with three options to repair the retaining wall with a "brief description, estimated cost, and schedule impact" for each.  (Doc. 57-5 at PageID 3773.)  On May 9, 2017, Mr. Keller, Mr. Barlow, and Mr. Klingshirn attended a "root cause meeting" at the Shreveport, Louisiana offices of AEP to determine what happened.  It was discussed at the meeting that Joy Global was going to have an independent engineering review conducted of the wall design estimated to take two to four weeks to complete.  (Doc. 59-7 at PageID 3990–3992.)

On June 1, 2017, Mr. Atkinson for Joy Global confirmed to Goettle that it had retained an engineering firm called Structural Engineering, Inc. to review "the geotechnical and structural engineering calculations and drawings."  (Doc. 59-13 at PageID 4008.)  Mr. Atkinson provided Goettle with a copy of the initial geotechnical review set forth in a May 27, 2017 email from Justin Thomey of Structural Engineering.  (*Id.* at PageID 4010–4012.)  Mr. Atkinson asked that Goettle's engineer "review and address" the concerns stated in the initial geotechnical review. (*Id.* at PageID 4008.)  He stated in an affidavit that the purpose of the June 1 email was to further

discussions about repairing the wall and "not to assign fault or to make a claim against any particular party." (Doc. 60-1 at PageID 4054.)

In the initial geotechnical review email, Mr. Thomey explained his process and initial conclusions:

> I thoroughly reviewed the plans, testing results (in -situ and lab), and geotechnical calculations. I limited my evaluation to the section of wall that has failed. I did not look in depth at the push pocket as this area is not, to my knowledge, under distress. This will be evaluated during the proposed scope revisions. *Overall, there are some errors and omissions that have me concerned.* Mainly, lack of certain calculations and lack of control on the work in the plans. Below are some basic summary points for the evaluations and some recommendations for future work and remediation.

(Doc. 59-13 at PageID 4010 (emphasis added).) Mr. Thomey again referred to "*errors and omissions* in the calculations and plans" in the tenth of his ten summary points. (*Id.* at PageID 4011 (emphasis added).)

Goettle's project manager forwarded the initial review email to other Goettle management that day. Mr. Keller, the CEO, read the initial review email, and Mr. Klingshirn, the engineer, read the email, re-examined his own design, and made comments expressing disagreement with some of Mr. Thomey's initial conclusions. Mr. Barlow, the Goettle project manager, agreed that Thomey's comments read as criticisms of Goettle's original design. (Doc. 59 at PageID 3927.)

Structural Engineering completed its final report on or about July 10, 2017, and Joy Global provided a copy of the report to Goettle on July 14, 2017. (Doc. 59-14 at PageID 4015, 4016.) Unlike in the initial review email, the final report lists a set of structural and geotechnical codes and standards used "as the basis for [the] analysis and code check." (*Id.* at PageID 4018.) Structural Engineering noted in the final report that there were "some errors and omissions that [were] of concern. There is a lack of certain necessary calculations and lack of control of the

work in the plans." (*Id.* at PageID 4019.) Structural Engineering concluded that "[t]he original wall design was insufficient and/or incomplete from a geotechnical standpoint." (*Id.* at PageID 4015, 4022.)

On August 10, 2017, Joy Global's attorney alleged in a formal written notice to Goettle that Goettle was in breach of contract because "the Retaining Wall for Truck Dump by Goettle ("TD-6") is defective in both design and construction as set out in the Structural Failure Analysis and Report authored by Structural Engineering, Inc. which was previously provided to Goettle on June [*sic*] 14, 2017." (Doc. 43-7 at PageID 1193–1194.)[3]

On September 6, 2017, Joy Global filed suit in federal court in Louisiana, *Joy Global Conveyors Inc. v. Richard Goettle, Inc.*, No. 5:17-cv-1121 (W.D. La.) ("Louisiana Action"), asserting claims against Goettle for negligent design, negligent construction, and breach of contract. (Doc. 1-2 at PageID 32–49.)

### D.    **Goettle's Reporting of Claim to Allied World**

Mr. Ginter, Geottle's CFO, who completed the insurance renewal application on behalf of Goettle on March 29, 2017, learned about the Dolet Hills failure incident at some point in April 2017. Mr. Ginter did not notify Goettle's insurance broker, USI Insurance, after learning about the failure incident.

Goettle's general counsel did not learn about the Dolet Hills failure incident until Goettle received the August 10, 2017 letter from Joy Global's attorney. Thereafter, on August 30, 2017, USI Insurance faxed to Cincinnati Intermediaries a "General Liability Notice of Occurrence/Claim" on Goettle's behalf. (Doc. 43-3 at PageID 1161–1165.) USI Insurance described the occurrence as follows:

---

[3] Despite the attorney's statement, the parties appear to agree that Joy Global gave Goettle the final report on July 14, not June 14.

> NOTICE OF POTENTIAL CLAIM—Joy Global (Gen Contractor) alleges
> Insured's design of retaining walls for a truck dump ram was defective causing
> the walls to bow out.

(*Id.* at PageID 1162–1163.)  USI Insurance attached to its Notice to Cincinnati Intermediaries an

email from Roger Healey of Goettle explaining Goettle's position on what occurred to warrant

the submission of the Notice:

> Doug has asked me to put you on notice of the above potential claims.  Richard
> Goettle, Inc. designed two retaining walls to support the Truck Dump Ramp to be
> constructed at the AEP Dolet Hills Site . . . .  Goettle contends that such action by
> the other subcontractor caused the welds on the upper portion of the struts to
> break and fail.  Joy Global now maintains that Goettle's design of the retaining
> walls is defective and that the retaining walls must be redesigned, all fill removed,
> the retaining properly reconstructed and the fill replaced.  Goettle maintains that
> the design of the retaining walls was not defective . . . .

(*Id.* at PageID 1164.)  Allied World acknowledged receipt of the Notice the next day on August

31, 2017.

David Robles, counsel for Allied World who testified as a corporate representative,

prepared an initial draft coverage letter dated September 22, 2017 in which Allied World

reserved its rights under the Policy and applicable law, but did not deny coverage.  (Doc. 43 at

PageID 924–925; Doc. 43-13 at PageID 1345–1356.)  That initial letter was not shared with

anyone outside of Allied World.  (Doc. 43 at PageID 925.)  Mr. Robles did not refer to or rely on

Endorsement No. 7 with respect to the coverage issues in this initial draft coverage letter.  (*Id.* at

PageID 1083.)

On October 6, 2017, Allied World issued its coverage determination to Goettle denying

indemnity and defense coverage for the Louisiana Action.  (Doc. 47-19 at PageID 2942–2954.)

Allied World summarized its reasons for denying coverage:

> Allied World concludes there is no coverage for the notified matter under the
> [2017–2018] Policy, because this matter constitutes a Claim made before the June
> 28, 2017 effective date of the Policy and because the terms of the "no prior
> knowledge" condition at B.3 of the Insuring Agreement is [*sic*] not met.  There is

also no coverage because, before the Policy's inception date, Goettle had knowledge of "any act, error or omission, unresolved job dispute …or any other circumstance that is or could be the basis for a claim," which was not disclosed to Allied World at any point after the Application date and before the Policy's inception.

(*Id.* at PageID 2954.)

## E.   <u>Procedural Posture</u>

On the same day it issued its coverage denial letter, Allied World filed this declaratory judgment action against Goettle seeking a declaration that it owes no obligation to Goettle for the Louisiana Action.  (Doc. 1.)  In the Complaint, Allied World asserted four bases for denying coverage to Goettle:

1.  There is no coverage under the 2017–2018 Policy because a Claim—as defined in Endorsement No. 7—was made no later than June 1, 2017 when Joy Global forwarded the Thomey initial review email to Goettle.

2.  There is no coverage under the 2017–2018 Policy because the "no prior knowledge" condition of coverage set forth in § 1(B)(2) of Endorsement No. 7 was not satisfied.

3.  There is no coverage under the 2017–2018 Policy because Goettle failed to disclose known pre-policy circumstances that reasonably could lead to a claim as was required in the policy renewal application.

4.  There is no coverage under the 2016–2017 Policy because a Claim was made against Goettle no later than June 1, 2017, but Goettle did not report the Claim to Allied World within sixty days of the end of the Policy Period.

(*Id.* at PageID 13–17.)  Goettle responded by filing an Answer [with] Affirmative Defenses and Counterclaims seeking a declaration that it is entitled to a defense and indemnification under the 2017–2018 Policy and damages for breach of contract.  (Doc. 7.)

Following discovery, the parties filed the pending cross-Motions for Summary Judgment. (Docs. 61, 62.)  The Motions are fully briefed and ripe for adjudication.  Allied World seeks judgment that it was not required to provide defense or indemnification for the Claim arising

from the Dolet Hills incident. Conversely, Goettle seeks judgment that it was entitled to defense and indemnification.

## II.   STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Because the parties have filed cross-motions for summary judgment, the Court must take care to consider each motion, separately placing the burden of proof on the moving party. *In re Morgeson,* 371 B.R. 798, 800–01 (B.A.P. 6th Cir. 2007)

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the

plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126,

132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable

jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation

omitted). Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*,

477 U.S. at 248. "The court need consider only the cited materials, but it may consider other

materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. ANALYSIS

## A. Interpretation of an Insurance Policy

"The interpretation of an insurance contract involves a question of law to be decided by a

judge." *Leber v. Smith,* 70 Ohio St. 3d 548, 639 N.E.2d 1159, 1163 (1994); *see also GenCorp,*

*Inc. v. American Int'l Underwriters,* 178 F.3d 804, 817 (6th Cir. 1999) (citing *Leber* for the same

principle.) "[W]ords and phrases used in an insurance policy must be given their natural and

commonly accepted meaning." *United Nat'l Ins. Co. v. SST Fitness Co.*, 182 F.3d 447, 449–50

(6th Cir. 1999) (quoting *U.S. Fidelity & Guar. Co. v. Lightning Rod Mut. Ins. Co.*, 80 Ohio St.

3d 584, 687 N.E.2d 717, 719 (1997)). Policy terms must be read in the context of the whole

policy. *Bondex Int'l, Inc. v. Hartford Acc. and Indem. Co*., 667 F.3d 669, 677 (6th Cir. 2011)

(citing *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.,* 78 Ohio

St. 3d 353, 678 N.E.2d 519, 526 (1997)). More specifically, courts examining whether a term or

phrase within a policy is ambiguous must "examine the policy as a whole" and "consider the

context in which the provision is used." *Sauer v. Crews*, 140 Ohio St. 3d 314, 18 N.E.3d 410,

413 (2014).

"The mere absence of a definition in an insurance contract does not make the meaning of

[a] term ambiguous" if the term has a "plain and ordinary meaning." *Nationwide Mut. Fire Ins.*

*Co. v. Guman Bros. Farm*, 73 Ohio St. 3d 107, 652 N.E.2d 684, 686 (1995). When policy provisions are susceptible to more than one meaning, "they must be construed strictly against the insurer and liberally in favor of the insured." *Schwartz Manes Ruby and Slovin, L.P.A. v. Monitor Liab. Managers, LLC*, 483 F. App'x 241, 244 (6th Cir. 2012) (citing *Westfield Ins. Co. v. Hunter*, 128 Ohio St. 3d 540, 948 N.E.2d 931, 935 (2011)). Similarly, when there are conflicting or contradictory terms in a policy, a court must construe the terms in favor of coverage for the insured. *See*, *e.g.*, *Cont'l Ins. Co. of New York v. Fortner*, 25 F.2d 398, 400 (6th Cir. 1928); *Para-Chem So., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, Nos. 21502, 21503, 2004 WL 344154, at *6 (Ohio App. Feb. 25, 2004); *Boyle v. Great-West Life Assur. Co.*, 27 Ohio App. 3d 85, 499 N.E.2d 895, 898 (1985).

**B.       Summary of Arguments**

**1.       Allied World's Position**

Allied World contends that it was not obligated to provide indemnity or defense coverage to Goettle under either the 2016–2017 Policy or the 2017–2018 Policy. To begin, Allied World asserts that the Insuring Agreement set forth in § 1 of Endorsement No. 7 replaced the Insuring Agreement set forth in § I of the Policy Form for both the 2016–2017 Policy and the 2017–2018 Policy. It further asserts that the replacement definition of the term Claim in Endorsement No. 7 applied to the entire 2016–2017 Policy and 2017–2018 Policy. The Endorsement No. 7 definition of Claim included a notice received by Goettle alleging a Wrongful Act, which was defined in the Policy Form to be a "negligent act, error or omission, in the rendering or failure to render Professional Services[.]" (Doc. 41-3 at PageID 648, 662; Doc. 41-7 at PageID 711, 725.) Accordingly, Allied World contends that the relevant Claim here occurred on June 1, 2017 when

Joy Global sent Goettle the Thomey initial review email alleging errors and omissions in the designs for the wall.  (Doc. 59-13 at PageID 4008–4012.)

Regarding the 2016–2017 Policy, Allied World argues that Goettle was entitled to coverage under § 1(B) of Endorsement No. 7 only if it received notice of the Claim against it during the Policy Period and reported it to Allied World within sixty days after the Policy Period.  (Doc. 41-3 at PageID 646.)  Because the Claim occurred during the 2016–2017 Policy Period, Goettle had to report the Claim to Allied World within sixty days after June 28, 2017.  However, Goettle did not report the Dolet Hills incident to Allied World until August 30, 2017.  (Doc. 43-3 at PageID 1161–1165.)  Allied World contends, therefore, that there was no coverage for the Dolet Hills incident under the 2016–2017 Policy because the Claim was not both made and reported within the Policy Period.  "Because coverage in a claims-made policy is generally restricted to only claims made and reported during the policy period, an insurer need not demonstrate prejudice to deny a claim that is made outside of the policy period."  *McCarty v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 699 F. App'x 464, 468 (6th Cir. 2017).

Allied World also contends that coverage was not provided under the 2017–2018 Policy, which had an effective date of June 28, 2017.  Allied World contends that coverage is excluded under the 2017–2018 Policy under § 1(B)(2) of the Insuring Agreement stated in Endorsement No. 7 because Goettle's officers had knowledge prior to the effective date about an actual or alleged Wrongful Act that reasonably could give rise to a Claim.  Additionally, Allied World argues that coverage was excluded under § 1(B)(3) of the Insuring Agreement stated in the Endorsement No. 7 because the Claim was made before the Policy Period.  (Doc. 41-7 at PageID 709.)

Finally, Allied World contends that coverage is excluded under the 2017–2018 Policy because Goettle denied in the policy renewal application at § 21 that any officers or employees of Goettle had knowledge of any "act, error or omission . . . accident or other circumstance that is or could be the basis for a claim under the proposed insurance policy." (Doc. 41-4 at PageID 676.) The denial was true when it initially was made because the Dolet Hills incident had not yet occurred. However, § 26 in the policy renewal application required Goettle to notify Allied World if any information supplied on the renewal application changed between the date of the application and the date the insurance became effective. (*Id.* at PageID 677.) Allied World contends that Goettle was put on notice of the claim on June 1, 2017 when it received the Thomey initial review email asserting errors and omissions in the design for the wall. Therefore, Allied World asserts, Goettle failed its duty to update the policy renewal application under § 26.

### 2.    <u>Goettle's Position</u>

Goettle responds that it does not seek coverage under the 2016–2017 Policy, but only under the 2017–2018 Policy. (Doc. 61 at PageID 4069 n.1; Doc. 67 at PageID 4511 n.1.) Its arguments for coverage are based on the premise that the Endorsement No. 7 should be interpreted only to add coverage for pollution events, but not to restrict coverage for non-pollution events by the insertion of inconsistent replacement terms.

Goettle also asserts that whether Goettle was entitled to coverage for the Claim arising from the Dolet Hills incident must be determined under the terms of the Policy Form. The Policy Form provided a narrow definition of the term Claim as a "demand received by an Insured for money or services." (Doc. 41-7 at PageID 722.) According to Goettle, Allied World did not make a Claim—a demand for money or services—until August 10, 2017 during the 2017–2018 Policy Period. (Doc 43-7 at PageID 1193–1194.) Goettle provided notice to Allied World about

the claim shortly thereafter on August 30, 2017.  (Doc. 43-3 at PageID 1161–1165.)  Therefore, it asserts that it was entitled to defense and indemnity under Coverage Part A of the Insuring Agreement of the Policy Form in the 2017–2018 Policy.  (Doc. 41-7 at PageID 715.)

**C.    Court's Analysis**

    **1.    Interpretation of Endorsement No. 7**

To determine whether the coverage existed under the Policy Form for the Dolet Hills incident, the Court first will address whether Endorsement No. 7 can be interpreted to apply to a non-pollution event.  For the reasons that follow, the Court agrees with Goettle that it can not. To begin, Endorsement No. 7 was titled COVERAGED OPERATIONS—POLLUTION COVERAGE ENDORSEMENT.  (Doc. 41-7 at PageID 709.)  The plain meaning of that title was to add insurance coverage for pollution events.  Endorsement No. 7 in § 1(A)(2) in fact did provide pollution coverage where Allied World agreed to provide Damages and Defense Expenses because of "Covered Operations performed for others" by Goettle "which result in a Pollution Condition."  (*Id.*)  However, Endorsement No. 7 also purported to delete and replace the Policy's professional liability coverage in § 1(A)(1) in a manner not suggested by, and therefore inconsistent with, the title.  (*Id.*)  Courts construe conflicting terms in favor of finding coverage for the insured.  *See*, *e.g.*, *Fortner*, 25 F.2d at 400; *Para-Chem So., Inc.*, 2004 WL 344154, at *6; *Boyle*, 499 N.E.2d at 898.  For example, an Ohio appeals court refused to apply an endorsement in an auto insurance policy when its title—Part 1-Liability-Other Insurance— suggested that the endorsement applied only when an outside type or policy of insurance was involved, but the terms of the endorsement acted to limit coverage provided to permissive users of a vehicle whether or not they had other insurance.  *Long v. Long*, No. C-050567, 2006 WL

1302516, at *5–6 (Ohio App. May 12, 2016).[4]  The court suggested that the title of an

endorsement should provide notice to the average reader in what circumstances the endorsement

would apply.  *Id.*  These cases suggest that Endorsement No. 7 here should not be interpreted in a

way that limits the professional liability coverage otherwise provided in the Policy Form because

the title suggests that it only supplements the policy with Pollution Condition coverage.

Additionally, Endorsement No. 7 and the Policy Form contain an irreconcilable conflict

in that a single event—such as an insured receiving notice of an alleged negligent act in the

rendering of Professional Services—can constitute both a Claim under Endorsement No. 7 and a

Potential Claim under the Policy Form.  A Potential Claim at § VIII(B)(4) of the Policy Form

was defined to be an actual or alleged act or omission in the performance of Professional

Services which could be expected to result in a Claim, a term defined in the Policy Form as *a

demand* for money or services.  (Doc. 41-7 at PageID 722, 724 (emphasis added).)  Professional

Services included engineering services performed for others.  (*Id.* at PageID 724–725.)  On the

other hand, the term Claim was broadly defined in Endorsement No. 7 to include *notice* alleging

a Wrongful Act, defined as a negligent act, error or omission in the performance of Professional

Services.  (*Id.* at PageID 711, 725.)  Allied World argues that when Joy Global forwarded the

Thomey initial review email to Goettle on June 1, 2017 during the 2016–2017 Policy period, that

---

[4]  This Court's decision in *Miami-Luken, Inc. v. Navigators Ins. Co.*, No. 1:16-cv-876, 2018 WL 3424448, (S.D.
Ohio July 11, 2018), does not compel a different result.  The Court recognized in *Miami-Luken* that the title of an
insurance policy is not determinative of the type of coverage provided.  *Id.* at *7.  However, the policy in *Miami-
Luken* explicitly stated that the "headings of the various sections of this Policy are intended for reference only and
are not to form the parts of the terms and conditions of coverage."  *Id.*  No such language is found in the 2017–2018
Policy.  Moreover, as explained in the analysis above, applying Endorsement No. 7 to non-pollution events creates
irreconcilable conflicts.

email amounted to receiving notice of Potential Claim for the Dolet Hills incident under the Policy Form and it constituted a Claim under Endorsement No. 7.[5]

The point in time at which Goettle needed to report an incident to Allied World to receive coverage was different under the Policy Form and under Endorsement No. 7. Under the Policy Form, Goettle had the option to report a Potential Claim to Allied World immediately or to wait until the Potential Claim matured into an actual Claim when the claimant made a demand for payment or services. (Doc. 41-7 at PageID 727.) Goettle's duty to report an incident to Allied World was different under ¶ 1(B)(4) of Endorsement No. 7. If Goettle received even notice of an alleged Wrongful Act, Goettle had to report that Claim to Allied World during that Policy Period

---

[5] "The question of what facts [the insured] knew is a subjective inquiry, while the question of whether [the insured] could reasonably foresee that these facts might give rise to a claim is an objective inquiry based on a 'reasonable insured' standard, on the subjective-objective analysis." *Schwartz Manes Ruby & Slovin*, 483 F. App'x at 245–46. The facts concerning when Goettle received notice of a Claim under Endorsement No. 7 or a Potential Claim under the Policy Form are not disputed. Joy Global sent Goettle the Thomey initial review email on June 1, 2017. Joy Global stated that it had hired Thomey's engineering firm to "review Goettle's original wall design." (Doc. 59-13 at PageID 4008.) It requested that Goettle provide feedback to the initial conclusions. (*Id.*) It also stated that Joy Global was waiting for the final structural engineering review, which was expected to be completed two weeks later. (*Id.*) Thomey's initial conclusion was that there were "errors and omissions" in the designs, particularly in regards to "lack of certain calculations and lack of control on the work in the plans." (*Id.* at PageID 4010.)

Goettle contends that the Thomey initial review email did not put them on notice of a Claim under Endorsement No. 7 or of a Potential Claim under the Policy Form for two reasons. First, Goettle points out that in the initial review email, Thomey did not use the word negligent or identify relevant engineering duties breached by Goettle. Conversely, the final engineering review completed in July 2017 contained a list of engineering codes and standards used as the basis for the analysis. (Doc. 59-14 at PageID 4018.)

Second, Goettle submits an affidavit of Larry Atkinson, Joy Global's principal engineer, and a report by T.C. Siegel, a civil and geotechnical engineer retained to provide expert opinion testimony in this case. (Docs. 60-1, 63-2.) Mr. Atkinson stated he sent the Thomey initial review email to Goettle on behalf of Joy Global "for the purpose of furthering the discussions about the structural failure and developing a plan to repair the wall" and not for assigning "fault" or making a "claim against a particular party." (Doc. 60-1 at PageID 4054.) He said he had not considered at that point whether Goettle was negligent in its design and engineering services. (*Id.* at PageID 4055.) Likewise, Siegel opined that a reasonable engineer would have considered Joy Global's cover letter to the Thomey initial review email to be "a standard procedure to communicate informal preliminary geotechnical comments from an engineer who was not part of the design team but only recently engaged as a peer reviewer." (Doc. 63-2 at PageID 4274.) He further states that the initial review was incomplete and that it did not state that Goettle breached any standard of care. (*Id.* at PageID 4274–4279.)

Allied World does not submit any evidence to rebut Mr. Atkinson or Mr. Siegel. Instead, it merely relies on the use of the phrase "errors and omissions" in the Thomey initial email review to support its argument that Goettle had notice of a Claim or a Potential Claim by June 1, 2017. The Court finds that a genuine issue of material fact remains as to whether a reasonable insured would have regarded the Thomey initial review email as notice that Joy Global considered Goettle to have been negligent in the rendering of design services.

or within 60 days after the end of the Policy Period.  (*Id.* at PageID 709, 711.)  An insurance policy should not be interpreted to have conflicting reporting requirements.

Next, Endorsement No. 7 was internally inconsistent because § 1(A)(1) purported to delete and replace the professional services liability coverage in the Policy Form and to apply to non-pollution events, but §§ 9 and 10 of Endorsement No. 7 required the insured, Goettle, to provide information about Pollution Conditions when it reported the Claim to the insurer, Allied World.  (*Id.* at PageID 709, 713.)  Sections 9 and 10 of Endorsement No. 7 stated that for the purposes of the reporting requirements set forth in the Policy Form at § VIII. Conditions, the term Wrongful Act was replaced by Pollution Conditions and the term Professional Services was replaced by the term Covered Operations.  (*Id.* at PageID 713.)  Thus, under § VIII(A)(1)(a) & (b) of the Policy Form, as modified by Endorsement No. 7, Goettle was required for each Claim made against it to give Allied World notice of the actual or alleged Pollution Condition that was the subject of the Claim and a description of the Covered Operations it rendered.  (*Id.* at PageID 726.)  Meeting this reporting requirement was an express "condition precedent" for coverage under the Policy.  (*Id.*)  Goettle never could have satisfied those reporting requirements for a non-pollution events such as the Dolet Hills incident because there were no Pollution Conditions ("discharge, dispersal, release or escape of smoke, vapors, soot, fumes . . . or pollutants into or upon the land") or Covered Operations ("physical construction operations and activities performed for others by [Goettle]") to report.  (*Id.* at PageID 712.)  An insurance policy should not be interpreted in such a way that the insured can never satisfy conditions precedent to coverage.

Finally, Endorsement No. 7 conflicted with Endorsement No. 4 in their respective treatments of the term Claim in the Policy Form.  Endorsement No. 7 in § 4(B) purported to

delete and replace the term Claim in the Policy Form. (*Id.* at PageID 711.) Endorsement No. 4, on the other hand, purported to modify and add to the definition of the term Claim in the Policy form but only for purposes of Endorsement No. 4. (*Id.* at PageID 696.) However, Endorsement No. 4 could not modify and add to the definition of the term Claim in the Policy Form if that term had been completely deleted by Endorsement No. 7.

In sum, the Court will not apply Endorsement No. 7 to exclude coverage for a non-pollution event like the Dolet Hills incident. Applying a coverage exclusion for a non-pollution event is inconsistent with what a reasonable insured would assume an endorsement with the title Pollution Coverage would provide. Under Allied World's interpretation of the Policy and the underlying facts, Endorsement No. 7 acted as a coverage exclusion for the Claim made against Goettle for Dolet Hills incident. The broader definition of the term Claim in Endorsement No. 7 would have required Goettle to report the Dolet Hills incident to Allied World during the 2016–2017 Policy Period, even before Joy Global made a *demand* for money or services and despite the fact that the Goettle was not required to report Potential Claims to Allied World. Additionally, Goettle could not have satisfied the reporting condition precedent for the Dolet Hills incident because it could not have identified a Pollution Condition resulting from the incident nor the Covered Services it provided.

Therefore, Endorsement No. 7 does not bar coverage for the Claim arising from the Dolet Hills incident because it does not arise from Covered Operations creating a Pollution Condition. Allied World's two bases for denying coverage for the Dolet Hills incident pursuant to Endorsement No. 7 of the 2017–2018 Policy—that § 1(B)(2) was not satisfied because Goettle had knowledge of an alleged Wrongful Act prior to the effective date of the Policy and that

25

§ 1(B)(3) was not satisfied because the Claim was made before the Policy Period—fail as a matter of law because Endorsement No. 7 is not applicable.

### 2.     <u>Policy Renewal Application</u>

The Court next will turn to Allied World's third asserted basis for denying coverage under the 2017–2018 Policy.  Allied World contends that Goettle breached an alleged duty under §§ 21 and 26 of the policy renewal application to inform Allied World about the alleged error or omission in the design of the retaining wall before the 2017–2018 Policy took effect.  Section 21 of the policy renewal application authorized Allied World to deny coverage for an error or omission if the Goettle had knowledge at the time of application about the error or omission that could give rise to a claim and failed to disclose it.  (Doc. 41-4 at 676.)  Section 26 provided that Goettle agreed to update the policy renewal application if the information supplied on the application changed.  (*Id.* at PageID 677.)  Goettle did not know about the Dolet Hills incident on March 29, 2017, the date of the renewal application, because the incident did not occur until April 2017.  Nonetheless, Allied World argues that Goettle's failure to update the insurance application after it received the Thomey initial review email was a basis to deny coverage.  It suggests that Goettle's agreement to update the application in § 26 operated as a warranty or a condition precedent to coverage.

"A warranty is a statement, description or undertaking by the insured of a material fact either appearing on the face of the policy or in another instrument specifically incorporated in the policy." *Allstate Ins. Co. v. Boggs*, 27 Ohio St. 2d 216, 271 N.E.2d 855, 858 (1971).  A breach of a warranty renders a contract void ab initio.  *Id.*; *see also Ohio Nat'l Life Assur. Corp. v. Satterfield*, 194 Ohio App. 3d 405, 956 N.E.2d 866, 871 (Ohio App. 2011).  A condition precedent calls "for the happening of some event, or the performance of some act, . . . before the

contract shall be binding on the parties." *Ramsey v. Penn Mut. Life Ins. Co.*, 787 F.3d 813, 822 (6th Cir. 2015) (*Mamaw v. W. & S. Life Ins. Co.*, 97 Ohio St. 1, 119 N.E. 132, 135 (1917)). Ohio law disfavors conditions precedent and warranties. *See Ramsey*, 787 F.3d at 822 (on conditions precedent); *Boggs*, 271 N.E.2d at 858 (on warranties). They are not read into insurance contracts unless the terms of the contracts make plain the intent to include them. *See Ramsey*, 787 F.3d at 822; *Boggs*, 271 N.E.2d at 858. No such intent is evident here.

Section 26 contained numerous provisions, including notices to applicants from specific states about state insurance statutes, in addition to the applicant's agreement to update the application. Significantly, § 26 did not provide a penalty for an applicant's failure to update information provided on the application. Instead, § 26 of the renewal application merely stated that if updates were made, then the insurer could withdraw or modify any quotations or agreements to bind insurance.[6] Section 26 cannot be enforced as a warranty or condition precedent. For these reasons, Goettle's failure to update the policy renewal application does not provide a basis for the denial of coverage.

### 3. Coverage Under the Policy Form of the 2017–2018 Policy

The Court is left to consider whether coverage was provided for the Dolet Hills incident under the Policy Form of the 2017–2018 Policy. The Insuring Agreement in the Policy Form obligated Allied World to pay "Damages and Defense Expenses" that Goettle became "legally obligated to pay as a result of a Claim first made during the Policy Period and reported in writing to [Allied World] during the Policy Period or within sixty (60) days thereafter arising out of a Wrongful Act in the rendering or failure to render Professional Services for others." (Doc. 41-7 at PageID 715.) It also provided that Allied World had a "right and duty to defend any Claim

---

[6] Allied World did not attempt to withdraw or change the quotation for the Policy after Goettle reported the Claim. Allied World kept the policy premium, but denied coverage.

against the Insured seeking Damages . . . even if the allegations of the Claim [were] groundless, false or fraudulent." (*Id.* at PageID 716.) Allied World did not assert any bases in the denial letter or in the Complaint for denying defense and indemnity coverage to Goettle for the Dolet Hills incident under the Policy Form of the 2017–2018 Policy. Goettle argues that Allied World has waived the right to assert any additional bases for denying coverage.

"An insurance company must pay for the defense of actions brought against its insured as long as the underlying complaint contains at least one potentially covered claim." *Medpace, Inc. v. Darwin Select Ins. Co.*, 13 F. Supp. 3d 839, 844 (S.D. Ohio 2014) (citing *Ohio Gov't Risk Mgmt. Plan v. Harrison*, 115 Ohio St. 3d 241, 874 N.E.2d 1155, 1160 (2007)). However, it need not "defend any action or claims within the complaint when all the claims are clearly and indisputably outside the contracted coverage." *Harrison*, 874 N.E.2d at 1160. An insurer's breach of the duty to defend is a material breach of the insurance contract and results in the insurer relinquishing the right to control the litigation. *Sanderson v. Ohio Edison Co.*, 69 Ohio St. 3d 582, 635 N.E.2d 19, 23–24 (1994). An insurer who has breached the duty to defend cannot object to the insured's decision to settle the lawsuit, absent a showing of fraud or collusion. *Id.*

In this case, Joy Global sent written notice that it considered Goettle to be in breach of contract for designing a defective wall on August 10, 2017 during the 2017–2018 Policy Period. (Doc. 43-7 at PageID 1193–1194.) Joy Global informed Goettle that if it did not "cure" its breach of contract by completing an approved remediation, then Joy Global would seek redress via legal action. (*Id.*) Joy Global shortly thereafter filed the Louisiana Suit against Goettle, alleging that Goettle was negligent in its design and construction of the retaining wall at Dolet Hills. (Doc. 1-2 at 32–49.) These acts constituted at least the assertion of a potentially covered

Claim (a demand for money or services) against Goettle arising from a Wrongful Act (a negligent act, error, or omission) in the rendering of Professional Services (engineering services). (Doc. 41-7 at PageID 722–725.)  Goettle, in turn, timely reported the Claim to Allied World. (Doc. 43-3 at PageID 1161–1165.)  Allied World was obligated, therefore, under the terms of the Insuring Agreement in the Policy Form to provide a defense to Goettle in the Louisiana Action.

However, the Court cannot determine at this time whether Allied World has an ultimate duty to indemnify.  An insurer's duty to indemnify is distinct from its duty to defend.  *Medpace*, 13 F. Supp. 3d at 847.  The duty to indemnify must be based on more than the allegations of the complaint in the underlying lawsuit.  *Id.*  "[T]he ultimate realization of [the duty to indemnify] depends on disposition of the underlying litigation."  *AMCO Ins. Co. v. Lauren-Spencer, Inc.*, 500 F. Supp. 2d 721, 736 (S.D. Ohio 2007); *see also ACE European Group, Ltd. v. Abercrombie & Fitch Co.*, No. 2:12-cv-1214, 2:11-cv-1114, 2013 WL 5180939, at *8 (S.D. Ohio 2013); *Erie Ins. Exch. v. Colony Dev. Corp.*, 136 Ohio App. 3d 406, 736 N.E.2d 941, 946 (1999) ("[S]peculation about the insurer's ultimate obligation to indemnify is premature until facts excluding coverage are revealed during the defense of the litigation and the insurer timely reserves its rights to deny coverage."), *reconsideration denied*, 136 Ohio App. 3d 419, 736 N.E.2d 950 (2000).  As to Goettle's contention that Allied World has waived the right to assert bases for non-coverage that were not asserted in the Complaint, "in Ohio, waiver and estoppel cannot be invoked to create coverage under an insurance policy where coverage otherwise does not exist."  *Carolina Cas. Ins. Co. v. Canal Ins. Co., Ohio*, 940 F. Supp. 2d 753, 761 (S.D. Ohio 2013), *rev'd on other grounds and remanded*, 555 F. App'x 474 (6th Cir. 2014); *see also Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 64 Ohio St. 3d 657, 597 N.E.2d 1096, 1104 (1992)

("[A]s a general proposition, the doctrine of waiver cannot be employed to expand the coverage of a policy.").[7]

The Court will award summary judgment to Goettle, and deny it to Allied World, insofar as Allied World has breached its duty to provide a defense to Goettle in the underlying Louisiana Action. However, the Court holds in abeyance the issue of indemnification.

## IV.   **CONCLUSION**

For the foregoing reasons, Allied World's Motion for Summary Judgment (Doc. 62) is **DENIED IN PART** and Goettle's Motion for Summary Judgment (Doc. 61) is **GRANTED IN PART**, both on the issue of Allied World's duty to provide a defense. The Court holds in abeyance the issue of indemnification.

This case is stayed pending the resolution of *Joy Global Conveyors Inc. v. Richard Goettle, Inc.*, No. 5:17-cv-1121 (W.D. La.). The parties shall notify the Court when *Joy Global Conveyors* case is resolved.

**IT IS SO ORDERED.**

Dated this 28th day of May, 2019.

BY THE COURT:


S/Susan J. Dlott
Susan J. Dlott
United States District Judge

---

[7] Goettle confusingly cites to the principle of *res judicata* when arguing that Allied World cannot assert a new basis for denying indemnification. However, *res judicata* applies only when a first litigation has reached a final judgment. *See Mitchell v. Chapman*, 343 F.3d 811, 819 (6th Cir.2003); *Rogers v. City of Whitehall*, 25 Ohio St. 3d 67, 494 N.E.2d 1387, 1388 (1986). It is, therefore, inapplicable here.